UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NENITA ANGELES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) CIVIL ACTION NO.: _____ |
| ALEX USON, | ) |
| ADRIANA ALEXIS USON-ONG, | ) |
| USON PROPERTIES LLC., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT

Plaintiff Nenita Angeles ("Ms. Angeles"), resident of Massachusetts since 2001,

brings this action against Alex Uson ("Mr. Uson"), Adriana Uson-Ong ("Adriana"), both

citizens of the Philippines, and a company they partially owned, Uson Properties LLC

("Uson Properties"), to seek relief from a judgment fraudulently obtained and to recover

half of the approximately $1,800,000 that she is entitled to but entirely denied from her

by fraudulent means. The $1,800,000 is earned and profited from a property located at 10

Ashton Place (aka 10 and 12 Ashton Place) in Cambridge that Ms. Angeles obtained

through her bank loans and was solely titled to her, and for seven years, without

monetary compensation, arduously devoted her professional services to its development.

The Defendants without regard inordinately defrauded and wrongfully utilized the court

to deprive and divest Ms. Angeles of her rights, her interests, and her benefits – for them

to entirely gain the earnings and profits made from the said Property. Plaintiff asserts

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
| --- | --- | --- |
| NENITA ANGELES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION NO.: _____ |
| ALEX USON, | ) | |
| ADRIANA ALEXIS USON-ONG, | ) | |
| USON PROPERTIES LLC., | ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT**

Plaintiff Nenita Angeles ("Ms. Angeles"), resident of Massachusetts since 2001, brings this action against Alex Uson ("Mr. Uson"), Adriana Uson-Ong ("Adriana"), both citizens of the Philippines, and a company they partially owned, Uson Properties LLC ("Uson Properties"), to seek relief from a judgment fraudulently obtained and to recover half of the approximately $1,800,000 that she is entitled to but entirely denied from her by fraudulent means. The $1,800,000 is earned and profited from a property located at 10 Ashton Place (aka 10 and 12 Ashton Place) in Cambridge that Ms. Angeles obtained through her bank loans and was solely titled to her, and for seven years, without monetary compensation, arduously devoted her professional services to its development. The Defendants without regard inordinately defrauded and wrongfully utilized the court to deprive and divest Ms. Angeles of her rights, her interests, and her benefits – for them to entirely gain the earnings and profits made from the said Property. Plaintiff asserts

1

claims for bank fraud, contract fraud, deception, wrongful eviction, fraudulent conveyance, perjury, identity theft, and concealment of truth from the court.

## PARTIES

1.     Plaintiff Nenita Angeles is a citizen of the Philippines but resides in Massachusetts since 2001.

2.     Defendant Alex Uson is, upon information and belief, a citizen of the Philippines who resides at No. 1 Sitio Ibaba, Bario Bignay, Valenzuela City, Philippines, and is a member and principal owner of Uson Properties LLC.

3.     Defendant Adriana Uson-Ong is, upon information and belief, a citizen of the Philippines who resides in Singapore but uses a permanent address of No. 1 Sitio Ibaba, Bario Bignay, Valenzuela City, Philippines. She is a daughter of Alex Uson, and is a member of Uson Properties LLC.

4.     Defendant Uson Properties LLC is, upon information and belief, an entity formed in February 19, 2013, comprised of Alex Uson and his family, including Adriana Uson-Ong.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1332, as the Defendants are citizens and residents of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.     Venue in this District is proper pursuant to 28 U.S.C. § 1391, in that the Plaintiff resides in Massachusetts.

7.     Venue in this District is proper pursuant to 28 U.S.C. § 1391, as the Defendants engaged and transacted business in Massachusetts, and pertinently because

the property at issue, 10 and 12 Ashton Place in Cambridge is located in this District.

8.      Venue in this District is proper pursuant to 28 U.S.C. § 1391, as Defendant Uson Properties LLC is incorporated in the Commonwealth of Massachusetts.

## FACTS

9.      The genesis of the case is the business partnership between Ms. Angeles and Defendant Alex Uson that they entered into in 2005 and went sour in 2012 when Mr. Uson fabricated a dispute via creatively crafted foreclosure scheme – at the time when the goals of the business partnership and the fruition of Ms. Angeles's business idea and hard work were so close at hand.

10.     Ms. Angeles was wrongfully and unjustly evicted from the Property on September 13, 2012 by virtue of a Landlord-Tenant law, G. L. c. 239, §3,  while she solely holds a total of more than $750,000 mortgages in her name that encumbered the Property. During the time of the eviction, Ms. Angeles was receiving mortgage statements and making payments to her mortgages.

11.     Mr. Uson through his counsel, Attorney Levin, initiated the summary process in Cambridge District Court sometime August of 2012 to evict Ms. Angeles from the Property, claiming ownership by virtue of a quitclaim deed despite knowing the Property is encumbered with three mortgages all in Ms. Angeles's name, and that Massachusetts law requires "a deed of quitclaim and release" or discharge of any encumbrances – to lawfully convey a property.

12.     Not only Mr. Uson concealed the truth from Cambridge District Court that the Property is encumbered with Ms. Angeles's mortgages, Mr. Uson also concealed

from Cambridge District Court and Ms. Angeles that on June 25, 2012, Ms. Angeles's

primary mortgagee, Central Mortgage Company ("Central Mortgage") located in

Arkansas, responded to Mr. Uson's inquiry through his counsel, Attorney Baltay, stating:

> Central Mortgage Company is unable to communicate with you
> regarding the information furnished to us. Mr. Uson is not our
> borrower and does not have the authority to authorize anyone to
> communicate on this loan.
> The fact that this property has been deeded to Mr. Uson simply
> means that he will need to pay off the loan.

13.     Mr. Uson not only did not comply with Central Mortgage's lawful

requirement of him paying off the loan, but worse, he evicted the borrower of the loan

without informing the bank, and worst, Defendants assumed the loan by fraudulently

using Ms. Angeles's identity.

14.     Defendants fraudulently transacted with Central Mortgage by using

Plaintiff's identifying information pertinently her social security number to access Ms.

Angeles's mortgage account. Defendants by unlawfully using Plaintiff's personal

information – created an electronic mail address, nenitaangeles10@gmail.com, in order

to access her mortgage account and continue the fraudulent transactions with Central

Mortgage – all unauthorized by Ms. Angeles

15.     The Property was inadvertently conveyed to Mr. Uson via quitclaim deed

when Ms. Angeles signed the Dissolution of Partnership Agreement ("Dissolution

Agreement") that purportedly transferred the Property to him. Ms. Angeles signed the

Dissolution Agreement on May 29, 2012 – the first time it was shown to her.

16.     Ms. Angeles, who at that time was in medication as part of her rigorous

cancer treatment, signed the Dissolution Agreement without reading it in full and

knowing what it contained because she was so troubled after being threatened by the Defendants that they could put her in jail if they so want.

17.     The Defendants deceived Ms. Angeles that her records and receipts did not account for the total funds of $1,360,594.40 she allegedly received for the business partnership, and that she is liable for the alleged huge missing amount. But years later, when Ms. Angeles's bank records were produced, and with her painstaking efforts, it was substantiated that Ms. Angeles received an approximate net amount of $1,274,743.00 and Ms. Angeles's records and receipts of expenses approximately amount to $1,268,885.00. Ms. Angeles attributed the difference to several years of home insurances, other utility bills, and other payments she made but not included in the summary of expenses. The allegation was proven to be untrue and just but a trick for her to sign the Dissolution Agreement.

18.     The Dissolution Agreement was prepared very well in advance without Ms. Angeles's knowledge. It is one-sided and unconscionable, it altered and fraudulently misrepresented the true Business Partnership Agreement ("Partnership Agreement") Ms. Angeles and Mr. Uson signed in 2005.

19.     During summary process hearing, Ms. Angeles clearly stated that "Plaintiff does not have an equitable title to the property" and that the transfer of quitclaim deed was because of "intimidation and deceit". Ms. Angeles likewise requested the case "be transferred to a civil docket" because it is "not a tenant/landlord dispute." Despite of Ms. Angeles's ardent requests – the hearing was ordered to proceed.

20.     As Defendants took away the thousands but neatly organized records and receipts of the business partnership from Ms. Angeles against her will on June 1, 2012,

and copies were given to her only two or three days before the hearing, Ms. Angeles was unable to defend her rights and interest, and was unable to refute the false allegations against her. More so, Defendants did not provide copies of the bank statements filed in a red binder that Ms. Angeles requested in the discovery, which if Ms. Angeles obtained, will reveal that there was no missing amount, and Defendants just outright deceived Ms. Angeles.

21.     The summary process hearing only had three evidences, Dissolution Agreement, quitclaim deed, and the 30-day notice to quit – all from Mr. Uson. There were three witnesses as well, Attorney Baltay, Dino Confalone, and Andrea Boyer – all for Mr. Uson. The decision favored Mr. Uson.

22.     Aggrieved with the decision and disturbed that Cambridge District Court in essence ordered her to abandon and violate her lawful financial commitment with her mortgagees, Ms. Angeles appealed the decision.

23.     However, Ms. Angeles was required to post a bond for $60,000. But because she was in debt for more than $750,000 worth of mortgages, she appealed to waive the required bond.

24.     The hearing for the said appeal was held in the Massachusetts Appellate Court on November 19, 2012. The court, "after hearing, upon review of the affidavits, written materials, and oral arguments of the parties" denied Ms. Angeles's motion to waive the $60,000 bond. Only for Ms. Angeles to discover several years after that the affidavit supposed to be Mr. Uson's – was not of Mr. Uson's signature. It was a forged signature.

25.     Like the Dissolution Agreement, Mr. Uson's affidavit also contained fraudulent misrepresentations that were creatively crafted to portray Mr. Uson as businessman who became frustrated with the outcome of the seven-year business partnership. As set forth more fully below – it is crafted to cover up his failure to provide the money in timely manner  as required in the business partnership agreement they entered into in 2005, and to fully deny Ms. Angeles of her lawful rights, interests, and benefits so they can entirely gain all the earnings and profits made from the Property.

26.     It was sometime in early 2005 that Ms. Angeles discovered a property known as and numbered 10 Ashton Place, Cambridge, Massachusetts (the "Property). An architect by profession, she assessed the feasibility of developing the home and the freestanding carriage house at the Property into condominiums units.

27.     Knowing the development will necessitate a significant amount of money, Ms. Angeles initially thought of acquiring the Property but still will keep the current tenants as it generates substantial rental income to pay the monthly mortgage. Once the Property already has equity, Ms. Angeles intends to apply for a construction loan for the development.

28.     Ms. Angeles then went to different banks and discussed her business plan. She then got her pre-approval. But she still needs an investor for the necessary down payment. She thought of presenting the business plan to prospective investors.

29.     One of them is Mr. Uson. Ms. Angeles had known Mr. Uson and his family for 20 years or so. Mr. Uson and his wife commissioned Ms. Angeles in 1992 to design and manage the construction of their family home. Ms. Angeles subsequently worked on for couple of projects more for Mr. and Mrs. Uson before she left the

Philippines in 1995 to study in Japan. She then worked with a German construction firm. And came to Massachusetts in 2001 for a job offer, and lives here since then.

30.    Ms. Angeles discussed the plan to Mr. Uson that involved: (i) the purchase of the Property; (ii) the renovation of the three-story family house located at 10 Ashton Place (the "First Property"); (iii) the demolition and construction of the detached freestanding carriage house at the Property into an attached but independent two-story unit currently known as 12 Ashton Place (the "Second property"); and the future sale of the renovated units and land as condominiums (the "Project"). Ms. Angeles told Mr. Uson the business idea would yield approximately Million Dollar profit.

31.    Mr. Uson was interested and instead of just lending Ms. Angeles some money for the initial investment needed, Mr. Uson suggested a business partnership. Ms. Angeles excited that she does not need to wait several years for the property to have equity and make another loan out of it to finance the construction – gladly agreed.

32.    Ms. Angeles then discussed the business partnership plan with the bank. She was told that if the partnership involved a foreign partner or entity, the bank would require 40% down payment. If Ms. Angeles would buy it by herself, the bank would require 15%. Mr. Uson declined to the 40% down payment.

33.    Through series of telephone communications, Ms. Angeles and Mr. Uson agreed that Ms. Angeles would acquire the Property for roughly through bank loans, and Mr. Uson will provide the funds for the development and for the monthly mortgage payments while the Project is on going. And they will divide whatever profits made from the Project.

34.    In May of 2005, Ms. Angeles and Mr. Uson began drafting a business

partnership agreement (the "Partnership Agreement"). During the drafting process, drafts were sent back and forth between Ms. Angeles and Mr. Uson and to their lawyers as well to ensure they were both satisfied with the terms of the partnership Agreement.

35.     On July 25, 2006, Ms. Angeles and Mr. Uson entered into the Partnership Agreement, attached as Exhibit A hereto.

36.     Under the Partnership Agreement, Ms. Angeles was to receive legal title of the Property but both Ms. Angeles and Mr. Uson were to have equal beneficial interests in the Property and obligations to maintain and pay for the expenses of the Property and Project. Ms. Angeles was responsible for and did acquire two loans in the amount of $742,334 that were out towards the purchase price and acquisition of the Property. Mr. Uson in turn, was responsible and did pay a portion of the balance of the purchase price in the amount of $131,000 as well as other closing or acquisition cost remaining due after applying the mortgage funds obtained by Ms. Angeles.

37.     The closing for the acquisition of the Property occurred on August 8, 2005.

38.     In addition, the Partnership Agreement stipulated that during the renovation period Ms. Angeles would make all good efforts to obtain bank loans to fund the Project at the Property and was responsible for managing the Property and overseeing the renovation. Mr. Uson was responsible for providing any money required to fund the renovation costs to the extent it was not covered by loan funds and he was responsible for making all payments of principal and interest that became due on the mortgage loans obtained by Nenita for the acquisition of the Property and on any other loans obtained by Ms. Angeles for the renovation of the Property.

39.     Beginning immediately in October of 2005 and continuing through 2008, Ms. Angeles handled applying for and obtaining three local regulatory approvals and necessary permits for the Project. The necessary approvals for the project were opposed and disputed. Ms. Angeles struggled for years and spent enormous hours in obtaining all the three approvals, sometimes staying until past midnight for the local regulatory hearings.

40.     While working full time work as an architect, Ms. Angeles decided that for her to maximize her time to devote to the Project and in order to save money as well, she informed Mr. Uson that she will move into the Property. And she did on March 30th of 2006 or thereabouts. Mr. Uson has no hesitation because at that time, he was delayed in providing funds for the project. When Ms. Angeles moved into 10 Ashton Place, she was already using her own resources about $20,000 to cover the deficit in the partnership's funds.

41.     During these earlier phases of the Project, the unit was hardly habitable, so Ms. Angeles for the most part, stayed with her friends. It was so difficult for Ms. Angeles at that time because she was displaced, her regular scheduled was interrupted. Sometime early summer of 2006, Ms. Angeles fainted while she was at work in Boston. Ms. Angeles was rushed in the hospital in an ambulance. It turned out that Ms. Angeles was exhausted for lack of sleep and over fatigue, plus her living situation at Property. Ms. Angeles wanted to move back to her apartment but by summer of 2006, she had used about $30,000 of her own resources for the Project.

42.     Ms. Angeles was disappointed with the financial status of the partnership. She was struggling how to manage the Project because as a practice in any construction,

the funds for the construction are readily available any time. Ms. Angeles experienced unpleasant encounters from few contractors in the Project in her inability to make payments in time.

43.     Ms. Angeles was confused and frustrated because on March of 2006, she was approved for a $200,000 loan contingent upon the payment of a 2-month mortgage advance but Mr. Uson declined to pursue because he said it's a bit of high interest rate and said he rather finance the Project himself. But at the end of 2006, Ms. Angeles had used almost $45,000 of her resources to cover the deficit.

44.     The height of Ms. Angeles's struggle came in fall of 2006 when she was diagnosed with cancer. She incessantly called Mr. Uson to resolve the financial status of the Partnership, particularly that she needs her money back for her cancer treatment. All these time, Mr. Uson keep on saying to Ms. Angeles that he was experiencing financial problems with his other businesses in the Philippines. As a result, the funds for the partnership came so sporadically depending on Mr. Uson's financial situation with this other businesses in the Philippines.

45.     Although Mr. Uson is sending funds for the Project - whenever he can, the delays in the construction created monetary consequences. Ms. Angeles struggled to provide an estimate for construction expenses because when the funds came, instead of expending it for the construction, it will be expended for the mortgage payments.

46.     The inconsistent and unreliable funding of Mr. Uson for the project caused the construction to stop several times. And worse, it made the mortgages delinquent.

47.     Between 2007 and 2008, there was a three-month nonpayment for the primary mortgage that caused a pre-foreclosure situation. Ms. Angeles struggled to come

11

up with funds to settle the arrears. Ms. Angeles was compelled to make another loan to bring the arrears to current. Although Ms. Angeles did not mention the pre-foreclosure situation to Mr. Uson, Ms. Angeles explained to him that the delays in financing are already creating problems.

48.     The delays caused much unnecessary additional mortgage payments. One whole year of mortgage payments is about $60,000. Even in the Project construction, the delays cost approximately 20% to 25% extra in expenses.

49.     In January of 2008, all local regulatory approvals were all obtained. The demolition of the freestanding carriage house can now commence so that by spring, as Ms. Angeles calculated  - excavation can proceed, construction of the Second Property can start by March. Ms. Angeles called Mr. Uson informed him of the good news that all approvals and the Project can soon commence. Ms. Angeles waited for months but Mr. Uson was only sending funds for the mortgage payments.

50.     While waiting for the funds, Ms. Angeles started to employment opportunity. By mid of 2008, Ms. Angeles informed Mr. Uson that she intend to go back her job. She advised Mr. Uson that it is to the Project's benefits if she can full time supervise the critical part of the construction before she starts working full time again. Sometime August of 2008, Ms. Angeles successfully received a job offer from one of Boston's prestigious architectural firms. Ms. Angeles was sad not to pursue the offer but because the construction has not commenced yet, she did not to pursue it. Frustrated, Ms. Angeles called Mr. Uson and warned him that the local regulatory approvals are good only for year. The construction should commence before 2008 ends, otherwise, all the approvals would be forfeited. And she warned Mr. Uson that she would never again go

through the excruciating process of obtaining all the approvals.

51.     End of October 2008 when Mr. Uson sent funds to start the construction of the Second Property. In 2009 and in 2012 Mr. Uson had been sending funds for the Second Property and Second Property but in a sporadic timing.

52.     Although Ms. Angeles managed to work with the unpredictable schedule of funding, she cannot manage the Project the same way she manages project in her job. Typically, Ms. Angeles use a system called PERT/CPM or Program Evaluation and review Technique/Critical Part Method – basically it shows where a particular scope of work would start – and when it would stop; it allows good scheduling for the budget and for the manpower as well. It will predict when the project will be done and how much budget is still needed.

53.     Because of the delays and unpredictable schedule of funds from Mr. Uson, Ms. Angeles cannot employ this system. What Ms. Angeles did was – anytime there is a fund, she will proceed with the construction. If there is a delay in the funds, she stops. When she received the funds, she will call Mr. Uson to let him know. Then couple of weeks later, she will call him again and inform him where the funds were expended. Sometimes, she will send photos of the progress via e-mail. But most of the communications between Ms. Angeles and Mr. Uson were through telephone, Mr. Uson seldom uses e-mails.

52.     Although for the last couple of years, Ms. Angeles was confused why Mr. Uson approached this Project this way because Mr. Uson is a seasoned developer. He works with different projects and he understands that delays cause losses. But Ms. Angeles cannot do anything because she relied on Mr. Uson's excuse that he was

experiencing financial problems with his other businesses in the Philippines.

53.     Ms. Angeles can only work for the Project but cannot influence its completion because as the saying goes – the one who holds the purse has the control.

54.     October of 2009, Mr. Uson informed Ms. Angeles that he and his family together with friends are coming to visit. Ms. Angeles was delighted and excited to show the progress of the work. Mr. Uson said they will be staying in the First Property but Ms. Angeles explained that although she was living there at that time, her stay in the house was on and off, because it is till under construction.

55.     When Mr. Uson, his family and friends came – they saw the progress of the Project. MS. Angeles prepared to show the accounting she does for the project, basically she filed records, receipts, contracts and pertinent documents related to the Project. They are all neatly compiled per day, then per month, then per year. Bank statements were all in a red binder. But since Mr. Uson's visit was brief and with tight scheduled, they were unable to really sit down and discuss the matter but Ms. Angeles assured Mr. Uson – records and receipts are well organized.

56.     In 2011 though, Mr. Uson's funding for the Project became more delayed. Ms. Angeles became anxious because it is already causing delays to the mortgage payments. She called Mr. Uson several times but unsuccessful in getting hold of him. Then one time she called and Mrs. Uson answered the call, she informed Ms. Angeles that Mr. Uson was in the hospital that time and cannot discuss any business matters. Mrs. Uson's voice sounded a bit stressed. So Ms. Angeles lessened her calls believing Mr. Uson needed time to relax and not be stressed.

57.     Alarmed with the financial situation of the partnership, Ms. Angeles

thought of bringing another investor to the partnership to aid the unstable financial status of the partnership and to expedite the construction of the Project. Ms. Angeles did a due diligence for the idea. She discussed the proposal to Mr. Uson but nothing was pursued because he did not agree with it.

58.     Mr. Uson's refusal to have another investor to expedite the Project frustrates Ms. Angeles, that at one time, she blatantly but respectfully told Mr. Uson that her business idea was ruined, it is not a business anymore – it is now an investment.

58.     Ms. Angeles explained that her opportunity to accept a good job offer was gone, her credit score suffered tremendously, her own resources were all expended to support her in 6 years of working without monetary compensation – and she was not happy about it.

59.     Ms. Angeles then discussed the possibility of selling first the Second Property, which was 95% completed in early 2010. Ms. Angeles moved in there, arranged it nicely, keep it immaculately clean, and invited colleagues to show the unit. Ms. Angeles prepared a marketing material for the property even though the First Property was still incomplete.

60.     Ms. Angeles sought professional help to prepare a condominium plan, consulted a lawyer on how to proceed converting the Property into two separate condominiums. In 2010, condominium plans were prepared, submitted to a real estate lawyer, marketing materials were distributed to potential buyers.

61.     However, the real estate lawyer explained to Ms. Angeles that in order to separate the Property into two separate units with separate titles, the mortgage should be paid first because the bank will not allow the separation without being paid. Ms. Angeles

thought of an idea how to proceed. She called and discussed the issue with Mr. Uson and asked him that if he can provide about $50,000 or so, to cover the process expenses. Ms. Angeles said she intends to sell the Second Property no less than a Million, but with brokers' fees, lawyer's fees, documentation and all – there might be a need for extra money. Mr. Uson said he does not have extra $50,000 or so

58.   Mr. Uson carefully explained to Ms. Angeles that he was experiencing financial problems and at the same time he has concerns with his health but he promise he will take care of the finances of the business.

59.   But because there are serious delays in mortgage payments, Ms. Angeles was compelled to seek another loan for $30,000. She obtained a loan from a colleague, Ms. Ong. Ms. Angeles used the funds to get the loans to current and some of it, she used for the renovation of the First Property's third floor.

59.   Ms. Angeles also thought of renting out the Property to at least aid with the mortgage payments. She discussed the proposal with Mr. Uson sometime late 2011.

60.   Because of serious mortgage delinquencies in late 2011, Ms. Angeles received a pre-foreclosure notice from Central Mortgage. Ms. Angeles called the bank, asked advice from a lawyer, sought another loan to settle the delinquencies - she did everything to resolve the problem. Because she knows Mr. Uson is sick and it is not healthy for him to have additional stress.

61.   However, Ms. Angeles was unable to resolve the looming foreclosure. When she told the problem with Mr. Uson, he informed her that his daughter, Adriana, would take over for him because of his health.

62.   Ms. Angeles and Adriana discussed the foreclosure. Adriana reassured

Usons demanded accounting of the funds used for the Project. Ms. Angeles though startled and confused the way the Usons were behaving – obliged and provided the seven year's of records and receipts. Although disturbed, Ms. Angeles accommodated them, prepared food for them while they were conducting their accounting, and provided her bedroom for them to sleep in.

68.    It was a long and exhaustive day for Ms. Angeles who at that time was still taking medication as a part of her rigorous cancer treatment. The Usons asked her details of different receipts of different years, then asked her for coffee or water. Sometimes, the Usons would ask her documents that they know are in the second floor of the Second Property that made Ms. Angeles went up and down in the unit and made her more exhausted.

69.    The entire day of the May 28th was devoted to their accounting until the following day, the 29th. It was then that after the three of them had lunch and Ms. Angeles was in the kitchen that the Usons asked her to sit down with them in the dining table. Ms. Angeles was confused with the tone of Adriana's voice and the seriousness of the Usons' faces.

70.    Adriana started to raise her voice and berated Ms. Angeles. Blamed her that the Property went into a pre-foreclosure. Ms. Angeles nicely reasoned out that why she would be blamed if the funds from his father were delayed. Ms. Angeles explained that there was no point in time that there was a huge amount of money just idly sitting in the bank and she did not pay the mortgage.

71.    Ms. Angeles was explaining her side when the Usons suddenly told her that her records and receipts did not account to the total amount of funds she received for

Ms. Angeles that she would help with the foreclosure crisis. Adriana told Ms. Angeles that she would borrow from her fiancé's parents to come up with the funds. But asked Ms. Angeles that she needs to show something for her soon to be in laws

63.     Once Ms. Angeles received the document via e-mail she signed it right away and e-mailed back to Adriana without checking the accuracy of the information written on it.

64.     The pre-foreclosure was averted. But came March, April, and May – Mr. Uson did not send mortgage payments again. Compelled with the situation, Ms. Angeles proceed to rent the available areas of Property.

65.     Then on May 28, 2012, Monday at around 7:00 o' clock in the morning, unexpectedly, Mr. Uson and Adriana (together the "Usons") visited Ms. Angeles at the Second Property. Ms. Angeles was surprised but welcomed them and let them in to the Second Property she was staying.

66.     Shortly after the Usons got in, Adriana took Ms. Angeles aside and told her that Mr. Uson was not in good health and asked her that there not be any arguments, disputes or even raising of voices during the visit because it is bad for him. Ms. Angeles was confused why it is necessary for Adriana to tell her that, the Uson family knew Ms. Angeles for twenty years and not in one occasion they heard Ms. Angeles yell or argued with anyone. Confused but none the less, Ms. Angeles became mindful that any dispute should be avoided.

67.     The Usons immediately interrogate Ms. Angeles about the Property and the state of the Project. The Usons proceeded to storm through the Property, opening closets and cabinets in a very disturbing manner for Ms. Angeles. Then on the spot, the

17

the partnership. Allegedly, there was a huge amount missing and she is responsible for it. Seeing Ms. Angeles panicked, Adriana followed it up, saying "you know, we can put you in jail if we want".

72.     That moment Ms. Angeles could hear her own heart beat as if she was running. She panicked not because she feels guilty of the accusation, she panicked because she cannot think of any place where she could have put those receipts that the Usons said were missing. Ms. Angeles is a very organized person, loosing such amount of documents set her mind to panic.

73.     Seeing how threatened she was, the Usons suddenly took out a well-stapled documents, and handed it to her. When Ms. Angeles saw the first page of the document that looks very legal – Ms. Angeles called the lawyer who helped her before. But the lawyer was out in her door to pick up her daughter, told her she can help her the following day.

74.     When the Usons learned that a lawyer would help Ms. Angeles understand the legal meaning of the document,  the Usons suddenly said urged Ms. Angeles to drive for them to Boston. Ms. Angeles asked the Usons where in Boston they are going – the Usons did not provide any detail.

75.     And the three of them ended up in Usons' lawyer's office before it closes. Once in the office, they met Attorney Baltay who represented the Usons. Mr. Baltay suggested to proceed immediately to the document signing and asked the Usons to produce the quitclaim deed to the Property. Ms. Angeles inquired as to whether any of the banks holding the mortgages were aware of the transfer of title presented, but received a cryptic response that did not answer the question.

76.     Ms. Angeles so mindful of Mr. Uson's health condition, and anxious about the alleged huge missing money – signed the Dissolution Agreement without reading it in full and understanding what it contained.

77.     The following day seemed to be normal for the Usons. They continued to stay with Ms. Angeles, let her prepare food for them to eat, and asked her to drive for them to their meetings that Angeles have no knowledge of. Ms. Angeles was not aware of what is going on because she was not aware that she was already stripped of her rights and interest from the partnership.

78.     Ms. Angeles received a copy of the Dissolution Agreement midnight of June 1, 2012, hours before the Usons flew back to the Philippines.

79.     Only on Saturday, June 2, 2012 Ms. Angeles realized how the Usons deceived her.

80.     Immediately, Usons' broker came in and out of the Property that alarmed Ms. Angeles so much.

81.     On June 8, 2018 or thereabouts the Usons changed the locks of the First Property rendered it inaccessible to Ms. Angeles.

82.     Around late August of 2012, Ms. Angeles received a notice from Cambridge District Court for the summary process Mr. Uson initiated.

83.     The summary process was held on September 13, 2012 and Ms. Angeles was evicted from the Property while she holds all the mortgages in her name.

<u>COUNT I</u>
**(Bank Fraud – Alex Uson and Adriana Uson-Ong)**

84.     Plaintiff realleges and incorporates by reference paragraphs 1 through 83 of the Complaint as if set forth fully here.

85.     Mr. Uson inordinately deceived Central Mortgage when he unlawfully evicted Ms. Angeles from the Property mortgaged in her name without Central Mortgage's knowledge, then assumed Ms. Angeles's mortgage by unlawfully using Ms. Angeles's identity when he was asked by Central Mortgage to pay off the loan in full.

86.     Defendants accessed Ms. Angeles's mortgage account with Central Mortgage by fraudulently using Ms. Angeles's identifying information and bank information that made the bank believed the transactions were made by Ms. Angeles.

87.     One of the daughters of Mr. Uson, believed to be Adriana, called Central Mortgage sometime around September of 2012 in a fraudulent pretense that she is Ms. Angeles by unlawfully giving Ms. Angeles's identifying information and social security number, which made Central Mortgage reasonably believed it was Ms. Angeles and thus engaged in the transaction over the phone.

88.     In the said fraudulent call, the caller, believed to be Adriana, requested Central Mortgage to change the existing e-mail address of Ms. Angeles in the bank's record in to another e-mail address, nenitaangeles10@gmail.com, which the Defendants unlawfully created to access Ms. Angeles's mortgage account.

89.     Sometime August of 2012, the Defendants through their counsel, Attorney Baltay, wrongfully informed Central Mortgage that Ms. Angeles was in the Philippines and that monthly payments of her mortgage will be electronically transferred from the Philippines. Ms. Angeles was in Massachusetts at that time and was not in the Philippines. Ms. Angeles did not authorize the said communication.

90.     The fraudulent actions and deception of the Defendants with Central Mortgage Company aided them to wrongfully utilize the court to deny Ms. Angeles of

her rights, interests, and benefits. The bank fraud enabled them to execute their unconscionable scheme.

91.     Defendants' use of Ms. Angeles identifying personal information pertinently her social security number, the deliberate impersonation as Ms. Angeles, the unauthorized transaction with her mortgagee, the unauthorized access to her mortgage account – violated 18 U.S.C. §1344.

92.     Because of Defendants' bank fraud, Ms. Angeles lost her rightful 50% share from the earnings and profits made from the Property approximately $1,800,000.

93.     Because of Defendants' bank fraud, Ms. Angeles is still liable for the partnership's federal taxes approximately $21,000, and for other loans she incurred to support herself while working for the Project without monetary compensation.

94.     Ms. Angeles have been damaged by Defendants' bank fraud in an amount in excess of $900,000, to be determined at trial.

## COUNT II
### (Contract Fraud – Alex Uson)

95.     Plaintiff realleges and incorporates by reference paragraphs 1 through 83 of the Complaint as if set forth fully here.

96.     The Dissolution Agreement in the previous case was litigated on the issue of whether it was signed under duress or not, but not on the fraudulent misrepresentations it contained.

97.     The Dissolution Agreement was prepared by Mr. Uson and his counsel well in advance without Ms. Angeles's knowledge and was only presented to her for the first time on May 29, 2012 – when it was inadvertently signed.

98.     The Defendants argued in court in the previous case that Ms. Angeles was

22

not under duress when she signed the Dissolution Agreement and therefore valid because she and the Defendants went together to the Defendants' lawyer's office in Boston when the signing happened, and that the Defendants even stayed with the Plaintiff in the property during their visit – the court accepted the Defendants' argument and validated the Dissolution Agreement. But what the court failed to see was how this argument, though it happened, contradicted the Defendants' claims. Mr. Uson on his affidavit stated that he was "troubled" because Ms. Angeles misappropriated the funds of the business partnership, and claimed in the Dissolution Agreement that because of "loss of trust and confidence in Nenita" – he deemed it necessary to dissolve the partnership. It is contradictory in nature that if Mr. Uson was really troubled and has no more trust and confidence in Ms. Angeles – yet he and Adriana still stayed with her at the Property, trusted her to cook food for them to eat, and trusted her to drive them around Boston in their entire visit. The contradiction of the Defendants' arguments and claims evidently showed the presence of fraud.

99.    Mr. Uson fraudulently misrepresented in the Dissolution Agreement the true agreement he and Ms. Angeles entered into in 2005. According to the Dissolution Agreement, "Alex only had to infuse the amount of $145,450 in cash into the investment" and the "investment will be returned to Alex with profit within two years". Untrue. The Partnership Agreement clearly stated, "Alex shall be responsible for providing any cash monies required to fund the renovation cost at the Property..." more so, it stated, "between the date of the closing and the date of final disposition of the Property...Alex shall be responsible for making all payments of principal and interest which may become due on mortgage loan..." In the summary process, the Defendants' counsel, as the

primary witness, testified that this is the true agreement saying, "My Client Alex Uson, who is a businessman in the Philippines, would pay for everything. Ms. Angeles...would buy the property in Cambridge, would renovate it, and they would sell it. Mr. Uson would recoup what he put in, and then they would split 50-50 the proceeds beyond that."

100.    Mr. Uson in his response in the previous case admitted that sometime early 2006, Ms. Angeles discussed with him a loan she was approved for contingent upon the payment of a 2-month mortgage advance but he declined to pursue because it "was for a small loan with a high interest rate and no assurance it would be extended." The loan was for $200,000, and it only requires $10,000 as advanced 2-moth mortgage payments. If it is true that Mr. Uson only had to infuse $145,450 in cash into the partnership and that it will be returned to him with profit within two years, he should have let Ms. Angeles obtain the loan so he can have his $145,450 back with profits in less than two years. High interest rate of the loan should not be his concern because his supposed to be concern is to get back his investment with profits, if what the Dissolution Agreement stated is true – but as shown, it is not. The Dissolution Agreement misrepresented the true business agreement of Ms. Angeles and Mr. Uson.

101.    The Dissolution Agreement fraudulently misrepresented the total amount of funds for the partnership that unable Ms. Angeles's records and receipts to account for.

102.    The Dissolution Agreement stated that the partnership is being dissolve "with the concurrence of Nenita." Untrue. Ms. Angeles was not afforded an opportunity to read in full what the Dissolution of Agreement contained. There is no sensible reason that Ms. Angeles would sign the Dissolution Agreement that entirely transfer the Property to Mr. Uson, which as stated in the Dissolution Agreement is – " as partial

24

settlement of Alex's (Mr. Uson) share in the Partnership assets" and more so, Ms. Angeles would not sign the Dissolution Agreement that clearly states, "the transfer of the First Property and the Second Property to Alex shall not release Nenita from further liability". The Dissolution Agreement is so unconscionable.

103.   Mr. Uson's usage of the third mortgage of the Property with Ms. Anna Ong without communicating with him as one of the reasons to dissolve the partnership was not a legitimate reason. The Partnership Agreement, states, "Nenita shall make all good efforts to obtain bank loans to fund the renovation costs at the Property." Ms. Angeles made all the bank transactions in acquiring the property by herself, without Mr. Uson's permission.

104.   The Dissolution Agreement fraudulently misrepresented that only by Mr. Uson's cash provision of $145,450 "that Nenita was able to purchase and acquire the First Property, a part of which was later renovated and converted to include the Second Property". Untrue. Ms. Angeles acquired the Property through bank loans of approximately $750,000 solely in her name. Though Mr. Uson provided around $135,500 for the down payment, Ms. Angeles also provided almost $12,000 as the acquisition cost amounted to more than $147,000. On the first two years of the partnership, Ms. Angeles used her resources approximately $45,000 to cover the deficit.

105.   The Dissolution Agreement's fraudulent misrepresentations were creatively crafted by Mr. Uson to portray himself as businessman who became frustrated with the outcome of the seven-year business partnership. As set forth above, the truth is – it is crafted to cover up his failure to provide the money in timely manner  as required in the business partnership agreement they entered into in 2005, and to fully deny Ms.

Angeles of her lawful rights, interests, and benefits so they can entirely gain all the earnings and profits made from the Property.

106.    Because of Mr. Uson's contract fraud, Ms. Angeles lost her rightful 50% share of the earnings and profits made from the Property approximately $1,800,000.

107.    Because of Mr. Uson's contract fraud, Ms. Angeles is still liable for the partnership's federal taxes approximately $21,000, and for other personal loans she incurred to support herself while working for the Project without monetary compensation.

108.    As a result, Plaintiff seeks equitable rescission of the Dissolution Agreement and a declaratory judgment that it is void.

109.    But in an alternative pleading basis, should the Dissolution Agreement not be voided, Ms. Angeles seeks the damages caused by Mr. Uson's contract fraud in an amount in excess of $900,000, to be determined at trial.

## COUNT III
### (Deception – Alex Uson and Adriana Uson-Ong)

110.    Plaintiff realleges and incorporates by reference paragraphs 1 through 83 of the Complaint as if set forth fully here.

111.    As set forth above, Mr. Uson's deception with Ms. Angeles started in 2005 when they entered into the Partnership Agreement wherein he misrepresented his financial wherewithal. Ms. Angeles relied to his representation that he has the lump sum funds available – ready for disposal to pursue the Project.

112.    After Ms. Angeles procured the approximately $750,000 mortgage necessary to acquire the Property on August 8, 2005, she expected the funds for the Project from Mr. Uson to be readily available, but instead, on the first two years of the

Partnership, Ms. Angeles was obliged to use approximately $45,000 of her own resources to cover the deficit.

113.    In early 2006, as Mr. Uson continues to fail to provide enough funds for the Project, Ms. Angeles sought another loan and was approved for $200,000 contingent to a 2-month advance mortgage. Mr. Uson disagreed. Mr. Uson told Ms. Angeles that he would finance the Project. Ms. Angeles relied to Mr. Uson's representation to her significant detriment.

114.    On May 29, 2012, the Defendants deliberately deceived Ms. Angeles that her record and receipts did not account to the total funds she received for the partnership. But as established in the previous case, Defendants have used the wrong amount. Ms. Angeles's records and receipts accounted almost 99.5% to the correct amount of funds she received.

115.    Ms. Angeles relied to the Defendants' deception that there was a huge amount missing, so she signed Dissolution Agreement without reading it in full and knowing what it contained when she was threatened that they can put her in jail if they so want.

116.    Defendants continued to deceive Ms. Angeles even days after the signing of the Dissolution Agreement on May 29, 2012 – that the partnership still exists because the Defendants still asked her to go with them and drive for them to their meetings. Ms. Angeles has no knowledge that she was already stripped from all her rights and interest from their partnership agreement.

117.    Because of Defendants' deception, Ms. Angeles lost her rightful 50% share from the earnings and profits made from the Property approximately $1,800,000.

118.   Because of Defendants' deception, Ms. Angeles is still liable for the partnership's federal taxes approximately $21,000, and for other loans she incurred to support herself while working for the Project without monetary compensation.

119.   The Defendants' deception induced Ms. Angeles to sign the Dissolution Agreement without an opportunity to read it in full and know what it contained.

120.   As a result, Plaintiff seeks equitable rescission of the Dissolution Agreement and a declaratory judgment that it is void.

121.   But in an alternative pleading basis, should the Dissolution Agreement not be voided, Ms. Angeles seeks the damages caused by Defendants' deception in an amount in excess of $900,000, to be determined at trial.

### COUNT IV
### (Wrongful Eviction – Alex Uson)

122.   Plaintiff realleges and incorporates by reference paragraphs 1 through 83 of the Complaint as if set forth fully here.

123.   As set forth above, the decision of the Cambridge District Court to evict Ms. Angeles while she holds in her name the more than $750,000 mortgages that encumbered the Property is fraudulently obtained.

124.   The decision of the court to evict Ms. Angeles while she holds the three mortgages in her name is wrongful because in essence, the court ordered Ms. Angeles to break and violate her lawful financial commitment with her mortgagees.

125.   Mr. Uson without regard wrongfully utilized the court when he concealed the truth from the court that Ms. Angeles holds the equitable title of the Property when he initiated the summary process.

126.   Central Mortgage on its response to Defendants' counsel strongly stated

that Mr. Uson is not their borrower and required Mr. Uson to pay off the loan. Instead of paying off the loan as lawfully required, Mr. Uson unlawfully evicted Ms. Angeles without informing Central Mortgage he evicted their borrower from the Property.

127.     When Mr. Uson initiated the summary process and when the hearing was held, Mr. Uson is neither the owner nor the lessor of the Property, therefore has  no standing to initiate the summary process. Ms. Angeles holds the equitable title of the Property and Central Mortgage holds the legal title of it – Massachusetts being title theory state.

128.     The summary process decision was based from the fraudulent misrepresentations in the Dissolution Agreement, and untruthful testimonies.

129.     Because of Ms. Angeles's wrongful eviction, Ms. Angeles lost her rightful 50% share from the earnings and profits made from the Property approximately $1,800,000.

130.     Because of Ms. Angeles's wrongful eviction , Ms. Angeles is still liable for the partnership's federal taxes approximately $21,000, and for other loans she incurred to support herself while working for the Project without monetary compensation.

131.     Ms. Angeles have been damaged by the wrongful eviction in an amount in excess of $900,000, to be determined at trial.

### COUNT V
**(Fraudulent Conveyances – Alex Uson and Uson properties LLC)**

132.     Plaintiff realleges and incorporates by reference paragraphs 1 through 83 of the Complaint as if set forth fully here.

133.     On June 6, 2012, Mr. Uson recorded the quitclaim deed in Middlesex South Registry of Deeds while the Property was encumbered with three separate

mortgages all in Ms. Angeles's name.

134. The Dissolution Agreement that purportedly conveyed the Property to Mr. Uson contained fraudulent misrepresentations and should be void. But even if this Court, for unknown reasons, will find the Dissolution Agreement valid, still it should be void because Mr. Uson breached its foremost requirement. In the general provisions of the Dissolution Agreement, it states, "Alex shall be responsible for discharging the First Mortgage Loan, Second Mortgage Loan, and Third Mortgage Loan that are outstanding on the First Property and Second Property." When the trial for the underlying case was heard in November of 2016, the third mortgage loan was still not discharged.

135. When Ms. Angeles initiated a civil action against the Defendants on December 28, 2012. Mr. Uson again fraudulently conveyed the Property to Uson Properties LLC while Ms. Angeles holds the three mortgages that encumbered the Property.

136. When the Property was conveyed to Uson Properties on February 19, 2013, not only the Property was encumbered with mortgages, the Property also has a Federal tax lien on it. The lien was recorded on February 6, 2013. The Federal tax lien was for the business partnership of Ms. Angeles and Mr. Uson. Because Mr. Uson declined to register the business partnership with his name and Ms. Angeles's, the responsibility of the partnership's taxation falls on Ms. Angeles.

137. On July 3, 2019, Defendant Uson Properties LLC conveyed the Property to Mr. Mark Kon for $3,200,000, still has a Federal Tax Lien on it.

138. Because of fraudulent conveyances, Ms. Angeles lost her rightful 50% share from the earnings and profits made from the Property approximately $1,800,000.

139.   Because of fraudulent conveyances, Ms. Angeles is still liable for the partnership's federal taxes approximately $21,000, and for other loans she incurred to support herself while working for the Project without monetary compensation.

140.   The fraudulent conveyances of the Property by the Defendants when Ms. Angeles filed a lawsuit against them, and the Property being encumbered with different mortgages and a Federal tax lien on in violated not only Massachusetts law but federal law as well.

141.   As a result, Plaintiff seeks reversal of the fraudulent conveyances.

142.   But in an alternative pleading basis, should the Dissolution Agreement not be voided,   Ms. Angeles seeks the damages caused by Defendants' fraudulent conveyances in an amount in excess of $900,000, to be determined at trial.

## COUNT VI
### (Perjury – Alex Uson)

143.   Plaintiff realleges and incorporates by reference paragraphs 1 through 83 of the Complaint as if set forth fully here.

144.   On November 19, 2012, a forged signature in a supposed to be affidavit of Mr. Uson was submitted to the Appellate Court of Massachusetts. This affidavit with forged signature has been one of the three factors the Appellate Court denied Ms. Angeles's appeal to waive the $60,000 bond the court had ordered her in order to appeal her wrongful eviction. The $60,000 bond was preposterous considering Ms. Angeles was in great debt of more than $750,000 for a property that was wrongfully taken away from her.

145.   The said affidavit that has a forged signature of Mr. Uson also contained fraudulent misrepresentations. Tell the details.

146.   On October 4, 2013, under penalty of perjury, Mr. Uson stated on his affidavit submitted to the Superior Court of Massachusetts that because of his coronary artery disease, his physicians advised him not to travel out-of-country and only travel when necessary. This affidavit was signed by Mr. Uson a day after he flew out-of-country. Mr. Uson was on board, Flight No. PR730 on October 3, 2013. It might be true that he has a coronary heart disease but another reason that prohibits him from frequent travels is that he is required to first seek from the Philippine Court the permission to travel abroad.

147.   Because of Mr. Uson's perjury, Ms. Angeles lost her rightful 50% share from the earnings and profits made from the Property approximately $1,800,000.

148.   Because of Mr. Uson's perjury, Ms. Angeles is still liable for the partnership's federal taxes approximately $21,000, and for other loans she incurred to support herself while working for the Project without monetary compensation.

149.   The forged signature in the affidavit, and the fraudulent representations in Mr. Uson's two affidavits submitted to the court in the previous case adversely influenced the decisions of the court. The Massachusetts Appellate Court rendered an erroneous decision in favor of Mr. Uson because of the fraudulent representations in Mr. Uson's affidavit with a forged signature.

150.   Mr. Uson's fraudulent representations on his two affidavits submitted to the court and the forged signature on it violated 28 U.S.C. §1621.

151.   As a result, Ms. Angeles seeks a relief from judgment fraudulently obtained.

152.   But in an alternative pleading basis, should the judgment not be reversed,

Ms. Angeles seeks the damages caused by Mr. Uson's perjury in an amount in excess of $900,000, to be determined at trial.

## COUNT VII
### (Identity Theft – Alex Uson and Adriana Uson-Ong)

153.    Plaintiff realleges and incorporates by reference paragraphs 1 through 83 of the Complaint as if set forth fully here.

154.    Defendants accessed Ms. Angeles's mortgage account with Central Mortgage by fraudulently using Ms. Angeles's identifying personal information and bank information that made the bank believed the transactions were made by Ms. Angeles.

155.    One of the daughters of Mr. Uson, believed to be Adriana, called Central Mortgage sometime around September of 2012 in a fraudulent pretense that she is Ms. Angeles by unlawfully giving Ms. Angeles's identifying personal information and social security number, which made Central Mortgage reasonably believed it was Ms. Angeles and thus engaged in the transaction over the phone.

156.    Defendants created an e-mail address, nenitaangeles10@gmail.com, fraudulently assuming Ms. Angeles's identity.

157.    One of the daughters of Mr. Uson, believed to be Adriana, called Central Mortgage sometime around September of 2012 for the second time on the same day with the other fraudulent call, again, in a false pretense that she is Ms. Angeles by giving Ms. Angeles identifying personal information and mortgage account - requested Central Mortgage to change the existing e-mail address in the record to another e-mail address - nenitaangeles10@gmail.com. The e-mail address fraudulently created to access Ms. Angeles's mortgage account.

158.    Sometime August of 2012, the Defendants' lawyer, Attorney Baltay,

deliberately misinformed Central Mortgage saying Ms. Angeles was in the Philippines and transacted with the bank using Ms. Angeles's bank information. Ms. Angeles was in United States the entire year of 2012. The communication and transaction are both unauthorized.

159.    Because of identity theft, Ms. Angeles lost her rightful 50% share from the earnings and profits made from the Property approximately $1,800,000.

160.    Because of identity theft, Ms. Angeles is still liable for the partnership's federal taxes approximately $21,000, and for other loans she incurred to support herself while working for the Project without monetary compensation.

161.    The unauthorized transactions of the Defendants and Defendants' counsel with Ms. Angeles's mortgagee by using her identifying personal information, her social security number, her bank information, and assuming her identity – violated 18 U.S.C. §1028.

162.    As a result, Ms. Angeles seeks a relief from judgment fraudulently obtained.

163.    But in an alternative pleading basis, should the judgment not be reversed, Ms. Angeles seeks the damages caused by Defendants' identity theft in an amount in excess of $900,000, to be determined at trial.

## COUNT VIII
### (Concealment of truth from the court – Alex Uson and Adriana Uson-Ong)

164.    Plaintiff realleges and incorporates by reference paragraphs 1 through 50 of the Complaint as if set forth fully here.

165.    Defendant Alex Uson and his counsel for the summary process, Attorney Levin, deliberately concealed the truth from Cambridge District Court that when the

summary process was initiated to evict Ms. Angeles – the Property was still encumbered by three mortgages all in Ms. Angeles's name.

166.    More so, Mr. Uson concealed the truth from Cambridge District Court that before he initiated the summary process in August of 2012, on June 25, 2012 – Central Mortgage lawfully required him to pay off the full amount of the loan.

167.    Mr. Uson's counsel, Attorney Baltay, who stood as witness for Mr. Uson during summary process, deliberately concealed the truth from Cambridge District Court that he communicated with Central Mortgage around June 22, 2012 pertaining to Ms. Angeles's mortgage. And that on June 25, 2012, he received a response from Central Mortgage, saying, "Central Mortgage Company is unable to communicate with you regarding the information furnished to us. Mr. Uson is not our borrower and does not have the authority to authorize anyone to communicate on this loan. The fact that this property has been deeded to Mr. Uson simply means that he will need to pay off the loan." Ms. Angeles learned the said correspondence nearly two years after.

168.    Attorney Baltay is very much aware that at the time he testified on September 13, 2012, all the three loans that encumbered the Property were all in Ms. Angeles's name, and that Ms. Angeles was actually made payments to those mortgages.

169.    Mr. Uson by virtue of quitclaim deed and fraudulent Dissolution Agreement initiated summary process but he and his counsels, Attorney Levin and Attorney Baltay, deliberately concealed the truth from Cambridge District Court that he breached the fundamental requirement of his Dissolution Agreement that states, "[p]rior to transfer – Alex shall be responsible for discharging the First Mortgage Loan, Second mortgage Loan, and Third Mortgage Loan that are outstanding on the First Property and

Second Property."

170.   Mr. Uson's absence in the summary process hearing prohibited Ms. Angeles to question him his proper standing initiating the summary process; more so, to ask him about his fraudulent misrepresentations in the Dissolution Agreement. Mr. Uson's absence during the hearing further concealed the truth from the court.

171.   The deliberate act of Attorney Levin and Attorney Baltay in submitting only the Dissolution Agreement and not including the Partnership Agreement that Ms. Angeles and Mr. Uson entered in 2005 concealed from the court the fraudulent misrepresentations of the Dissolution Agreement

172.   Mr. Uson concealed from the court that prior to his initiation of the summary process to evict Ms. Angeles from the Property, he already locked out Ms. Angeles from the First Property around June 8, 2012 or thereabout – while Ms. Angeles was in full debt for all its mortgages. Ms. Angeles was compelled to open the First Property on the last week of August of 2012 to rent it out to students in order to pay the mortgages she was responsible for.

173.   More so, the Defendants concealed the truth from Cambridge District Court that before and during the time of the summary process and even after, they have been fraudulently using Ms. Angeles's identity, her identifying information, her social security number, and her bank information.

174.   The Defendants concealed the truth from the court that they have been transacting with Central Mortgage in a false pretense that they are the bank's borrower.

175.   Because of Defendants' concealment of truth from the court, Ms. Angeles lost her rightful 50% share from the earnings and profits made from the Property

approximately $1,800,000.

176.    Because of Defendants' concealment of truth from the court, Ms. Angeles is still liable for the partnership's federal taxes approximately $21,000, and for other loans she incurred to support herself while working for the Project without monetary compensation.

177.    Because of Defendants' concealment of truth from the court, the court has rendered an erroneous decision.

178.    As a result, Ms. Angeles seeks a relief from judgment of the previous case fraudulently obtained.

179.    But in an alternative pleading basis, should the judgment not be reversed, Ms. Angeles seeks the damages caused by Defendants' concealment of truth from the court in an amount in excess of $900,000, to be determined at trial.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff Nenita Angeles prays that this Court:

1.    Enter judgment in favor of Ms. Angeles and against the Defendants on all Counts prayed herein;

2.    Grant Ms. Angeles relief from the previous judgment fraudulently obtained.

3.    Issue an order deeming the fraudulent Dissolution Agreement as null and void.

4.    Award Ms. Angeles her rightful 50% share from the earnings and profits made from the Property approximately $1,800,000 as the contemplation of the 2005 Partnership Agreement.

5.    In the alternative pleading, should the Dissolution Agreement not be voided, Ms. Angeles seeks  damages she sustained as a result of Defendants' bank fraud,

contract fraud, deception, wrongful eviction, fraudulent conveyances, perjury, identity theft, and concealment of truth from the court in an amount in excess of $900,000, to be determined at trial.

6.     Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

**Nenita Angeles**
Pro Se
P.O. Box 380499
Cambridge, MA 02238
T: 617-5832255
E: nenita_angeles@consultant.com

Dated: March 6, 2020